Argued April 7, affirmed May 3, 1977

CONRADI et ux, *Respondents,*
*v.*
HELVOGT, *Appellant.*
(TC 414-381, SC 24472)
563 P2d 707

A. Thomas Cavanaugh, Portland, argued the cause and filed the briefs for appellant.

[ 229 ]

I. Franklin Hunsaker, Portland, argued the cause for respondents. With him on the brief were Bullivant, Wright, Leedy, Johnson, Pendergrass & Hoffman, Portland.

Before Denecke, Chief Justice, and Howell, Lent and O'Connell, Justices.

O'CONNELL, J., Pro Tempore.

**O'CONNELL, J.,** Pro Tempore.

This is an action by lessees against their lessor to recover damages for the loss of personal property which was burned when the leased residence was destroyed by fire. Defendant appeals from a judgment on a verdict for plaintiffs.

Defendant contends that inasmuch as he did not covenant to repair, he owed no duty to plaintiffs. He further contends that plaintiff did not establish a causal connection between defendant's conduct and the fire.

■ The evidence establishes that the residence defendant leased to plaintiffs was an old structure with a defective wiring system which caused fuses to burn out repeatedly. Defendant was aware of this condition and when plaintiffs complained to him he promised that he would take care of the problem shortly. Defendant did repair the wiring on a service pole about 60 feet from the house but made no effort to make any electrical repairs within the house. Plaintiff John Conradi testified that on several occasions he discussed with defendant the problem created by the fuses frequently blowing out. Evidence of defendant's affirmative conduct in undertaking to remedy the defect was brought out principally through the testimony of John Conradi:

> "MR. WERSCHKUL [attorney for plaintiffs]: Did Mr. Helvogt make any promises to you he would have this problem fixed?
>
> "A   Yes, he indicated to us this was a minor problem and he would have it taken care of very shortly.
>
> "Q   Did he ever fix that particular electrical problem?
>
> "A   No, he did not.
>
> "Q   Mr. Conradi, is there a service pole or was there a service pole in the back of the home which you rented from the defendant?
>
> "A   Yes, it was approximately 60 feet from the house.

"Q   At any time that you were renting this home from the defendant, did the defendant do any electrical wiring or electrical wiring on that service pole?

"A   Yes, he did.

"* * * * *

"A   When I got home the wires were still scattered all over the yard and approximately a month later Mr. Helvogt came out and I helped him raise the pole. He rewired the pole, took the wiring and switch out of the old barn and rewired the pole and tried to restore service to the pump.

"* * * * *

"Q   Did you discuss the problems of the fuses blowing with the defendant?

"A   Many times.

"Q   Would you describe some of those times to us?

"A   When Mr. Helvogt was out and wired up the pump and I discussed the problem of the blowing fuses with him then. We went down in the basement and I asked him who had done the wiring. He said he had done part of it and part of it was old wiring initially put in the house. He had already wired part of it himself. I said there was something drastically wrong. This thing should not be blowing fuses like this. He said, well, it didn't seem to him to be that big of a problem and wanted to know what fuses I was putting in. I said 15 amps. He said, 'Put in larger fuses.' I said, 'This is not the answer. All you are doing is working around the problem, not solving it.' He indicated to me, 'Well, you know, sometimes if you have to, you can always put a penny in the circuit.' I said, 'That is foolish.'

"Q   Did the defendant ever remedy any problems which you pointed out to him?

"A   No, he did not.

"Q   Did the defendant provide you with the fuses to be used in the home?

"A   Yes, he did. When we first moved in there in May when the pole blew over and my wife had informed him we were blowing fuses out, he brought out a box of six fuses.

"Q   Did he provide you with any fuses other than that box he brought out?

"A   When we were in the basement and I told him

the number of fuses required to keep the thing going, he said down in the basement there was a gallon jar of fuses. I said, 'Isn't this an abnormal amount of fuses to have on hand? This seems to indicate you had previous problems'

"* * * * *

"MR. WERSCHKUL: Q   John, did you testify all the fuses you used were provided you by the defendant?

"A   Yes. Mr. Helvogt instructed me to use these fuses."

Mrs. Conradi testified as follows:

"Q   Did the defendant make any promises to you that he would fix those circuits?

"A   Yes. And he said something, that he had some electrical work to finish up, very little.

"Q   Did he ever fulfill his promise in making repairs to the electrical circuits?

"A   Not to my knowledge; no, sir.

"* * * * *

"Q   Mrs. Conradi, did you ever suggest to the defendant that he have an electrician repair the electrical problems you were encountering in this home?

"A   Yes, sir.

"Q   What was his response to that suggestion?

"A   He said he could take care of it."

There was evidence in the form of expert testimony sufficient to support an inference that the fire was caused by the use of fuses of too high an amperage. There was also evidence from which the jury could infer that plaintiffs were not contributorily negligent in replacing the fuses.

We are of the opinion that the foregoing evidence was adequate to permit an inference that defendant induced plaintiffs to continue the use of fuses of too high an amperage and that the use of such fuses was the cause of the fire.

■  Defendant argues that liability cannot be imposed because no duty arose out of the landlord-tenant relationship inasmuch as the lease did not contain an agreement obligating defendant to make repairs.

[ 233 ]

Plaintiffs concede that no duty arose out of the landlord-tenant relationship but take the position that a duty did arise if the jury believed that defendant's conduct induced plaintiffs to use "oversized" fuses, thus creating the danger of an electrically caused fire. The trial court agreed with plaintiffs' analysis and instructed the jury in accordance with it. The principle relied upon by plaintiffs is explained in Prosser, Torts 410-11, § 63 (4th ed 1971). There it is said:

> "When the lessor does in fact attempt to make repairs, whether he is bound by a covenant to do so or not, and fails to exercise reasonable care, there is general agreement that he is liable for resulting injuries to the tenant * * *. It has been said that the lessor's liability does not rest upon his standing in the relation of landlord, but rather on his course of affirmative conduct endangering the plaintiff. * * *"[1]

There was evidence sufficient to show that defendant promised to and did take steps to eliminate the cause of the recurring interruption of the electrical service of which plaintiff complained. The promise did not create a contractual duty on defendant's part because there was no consideration for it, but the promise is important in showing that the tenant was given reason to rely upon the representation that the defect would be remedied by defendant. As one court has observed:

> "The basis of the liability of a landlord who gratuitously undertakes to make repairs performed negligently is the representation—that the repairs have been properly made—upon which the tenant relies to his injury."[2]

Purporting to fulfill his promise to remedy the defect defendant induced plaintiffs to use the fuses made available to them by defendant. Some of the fuses made available were inappropriate and created a risk of harm to plaintiffs' property. The jury could

---

[1] See Annotation, 150 ALR 1373 (1944), for a collection of cases applying the principle.

[2] Rubin v. Girard Trust Co., 154 Pa Super 257, 35 A2d 601, 602 (1943).

[ 234 ]

reasonably find that defendant's conduct in creating this risk constituted negligency, and therefore the trial court correctly denied defendant's motion for a directed verdict.[3]

Affirmed.

[3] Since the plaintiffs' theory did not rest upon a duty arising out of the landlord-tenant relationship, the court properly denied defendant's requested instruction to the effect that a landlord has no duty to repair in the absence of an express covenant to do so. Likewise, the requested instruction that a tenant takes premises as he finds them except for hidden defects known to the landlord and not communicated to the tenant was properly refused. The refusal to give these instructions was assigned as error on appeal.